NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

───────────────────────

Sullivan
Case Nos. 2024-0187
       2024-0188
Citation: State v. Dunbar, 2025 N.H. 26

THE STATE OF NEW HAMPSHIRE

v.

JAMES J. DUNBAR

Submitted: March 4, 2025
Opinion Issued: June 6, 2025

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Sam M. Gonyea, assistant attorney general, on the brief), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief, and Kirkland & Ellis LLP, of Chicago (Helen E. Witt on the brief), for the defendant.

MACDONALD, C.J.

[¶1] The defendant, James Dunbar, appeals an order of the Superior Court (Honigberg, J.) ruling that he violated the conditions of his probation and suspended sentence by contacting the victim via Facebook posts in violation of

a stalking final order of protection (the "protection order"). The defendant argues that his posts: (1) were not contact with the victim in violation of the protection order; and (2) cannot serve as the basis for imposing his suspended sentence or for a probation violation because they were constitutionally protected speech. We affirm.

## I. Background

[¶2] The trial court found the following facts, or they are otherwise supported by the record. In 2023, the defendant was serving the suspended portion of a sentence for his conviction for criminal mischief and was on probation for his conviction for being a felon in possession of a dangerous weapon. A term of the defendant's suspended sentence was to be on good behavior for three years, and the terms of his probation required him to "be of good conduct, obey all laws, and be arrest-free." He was also subject to a protection order which required that he "not have any contact with the [victim], whether in person or through third persons, including but not limited to contact by telephone, letters, fax, e-mail, the sending or delivery of gifts or any other method unless specifically authorized by the court."

[¶3] The defendant, while subject to the protection order, posted messages on his Facebook page. The posts referred to the victim and her deceased husband by aliases similar to their names. Some of the messages included phrases such as "[n]otification" to the "resident of [the victim's address]," and "[n]otification to [the victim and her husband] [and] family member as well better pay attention to this." In another message which the trial court found was directed at both the victim and her husband, the defendant said that they "better take this public notification seriously." Some of the messages included threats directed at the victim and her family. Facebook users viewed the messages and notified the victim, and she then viewed the messages. The defendant was arrested and charged with two counts of violating the protection order and one count of stalking, in part because his posts were alleged to have amounted to contact with the victim. The defendant was found not guilty on all charges.

[¶4] The arrest served as the basis for an allegation by the defendant's probation officer that the defendant had violated the terms of his probation, and of a motion by the State to impose the defendant's suspended sentence. The trial court found that the defendant's Facebook posts violated the protection order, and concluded that the defendant had, in turn, violated the terms of his probation and suspended sentence. The court imposed a portion of the defendant's suspended sentence and sentenced him to twelve months in the house of corrections, all suspended, for the probation violation. The defendant unsuccessfully moved for reconsideration. These appeals followed.

II. Analysis

[¶5] Probation may be revoked upon proof by a preponderance of the evidence that the defendant has violated the terms of his freedom. See State v. Kay, 162 N.H. 237, 244 (2011). To prevail on appeal, the defendant must show that the evidence, viewed in the light most favorable to the State, fails to support the trial court's decision. Id.

[¶6] The imposition of a suspended sentence is the remedy for a defendant's noncompliance with the conditions on which the sentence was suspended, not a punishment for the underlying acts. State v. Luikart, 174 N.H. 210, 214 (2021). Determining whether the defendant has violated a condition of his suspended sentence presents a separate task from determining whether the defendant may bear criminal liability for the same underlying acts. Id. (noting that a jury acquittal of criminal charges is not dispositive as to whether a suspended sentence should be imposed). Thus, in the context of considering a motion to impose the defendant's suspended sentence, the trial court must independently evaluate the evidence before it to determine whether the State proved, by a preponderance of the evidence, that a violation of the suspension condition occurred. Id. In order to prove a violation of good behavior in the absence of a criminal conviction, the State has the burden to prove the essential elements of the criminal conduct that amounts to the alleged good behavior violation, and must do so by a preponderance of the evidence. Id. at 216.

[¶7] The trial court found that because the defendant violated the terms of the protection order, he violated a condition of his suspended sentence and the terms of his probation. On appeal, the defendant argues that: (1) the trial court erred when it found that he contacted the victim in violation of the protection order; and (2) his Facebook posts are constitutionally protected speech that cannot serve as the basis for a probation violation or imposition of his suspended sentence. A challenge to the sufficiency of the evidence raises a claim of legal error, which we review de novo. See State v. Craig, 167 N.H. 361, 370 (2015). We also review questions of constitutional law de novo. S.D. v. N.B., 176 N.H. 44, 48 (2023).

A. Protection Order

[¶8] We first consider whether the defendant violated the protection order. The protection order prohibits the defendant from having "any contact with the [victim], whether in person or through third persons, including but not limited to contact by telephone, letters, fax, e-mail, the sending or delivery of gifts or any other method unless specifically authorized by the court." The order does not define "contact." However, RSA 173-B:1, IV (2022) defines "contact" as "any action to communicate with another either directly or indirectly, including, but not limited to, using any form of electronic

3

communication, leaving items, or causing another to communicate in such fashion." Although the parties argue otherwise, we conclude that this definition of "contact" is applicable to the protection order at issue.

[¶9] The protection order here was issued pursuant to RSA 633:3-a. RSA 633:3-a, III-a provides that a victim may, upon a showing of stalking by a preponderance of the evidence, be granted relief to stop the stalking. "The types of relief that may be granted . . . shall be the same as those set forth in RSA 173-B." RSA 633:3-a, III-a (emphasis added). RSA 173-B:5, I(a)(3) (2022), in turn, allows the victim to receive a protection order as a form of relief which can limit "the defendant from contacting the plaintiff." "Contact" as used in RSA chapter 173-B is defined in RSA 173-B:1, IV, and this definition of "contact" applies to protection orders issued pursuant to RSA chapter 173-B. See Craig, 167 N.H. at 365, 370-72 (applying definition of "contact" in RSA 173-B:1, IV to restraining order issued pursuant to RSA chapter 173-B). Accordingly, this definition of contact also applies to protection orders issued pursuant to RSA 633:3-a, III-a because otherwise the relief granted under RSA 633:3-a, III-a would not be "the same" as that under RSA chapter 173-B. See RSA 633:3-a, III-a; Fisher v. Minichiello, 155 N.H. 188, 193 (2007) ("RSA 633:3-a, III-a arguably mandates the applicability of our interpretation of RSA chapter 173-B to orders on civil stalking petitions."). Accordingly, "contact" as used in the protection order means "any action to communicate with [the victim] either directly or indirectly, including, but not limited to, using any form of electronic communication, leaving items, or causing another to communicate in such fashion." RSA 173-B:1, IV.

[¶10] The State argues that the defendant indirectly contacted the victim by posting messages to her on his public Facebook page which ultimately reached her. "Indirect" is not defined in the statute, nor is it defined in the order, and we therefore give it its plain and ordinary meaning, turning to the dictionary for guidance. See RSA 21:2 (2020); Appeal of Town of Lincoln, 172 N.H. 244, 248 (2019). "Indirect" is defined as "[n]ot directly aimed at or attained; not immediately resulting from an action or cause." Oxford English Dictionary, https://www.oed.com/dictionary/indirect_adj?tab=meaning_and_use (last visited May 30, 2025). Accordingly, the protection order prohibits the defendant from engaging in actions to communicate with the victim indirectly, including communicating by methods not directly aimed at her. We conclude that the defendant indirectly contacted the victim in violation of the protection order when he created public posts containing messages directed at the victim on his Facebook profile page with the intent to notify her, and those messages reached her.

[¶11] In State v. Craig, we considered the application of RSA 633:3-a in the context of postings on Facebook. See Craig, 167 N.H. at 369-70. As we stated in Craig, Facebook is a widely used social media website. See id. at 369.

4

The site is free to use by anyone with an email account, and the site allows users to share information, maintain a profile page, and send messages to other users, among other functions. See id. A Facebook profile page is a webpage that is intended to convey information about the user. Id. By default, a Facebook profile page is public, and when a user shares something publicly on their profile page, anyone — "including people off of Facebook" — can see it. See id. (quotations omitted).

[¶12] In Craig, we held that the defendant contacted the victim in violation of a restraining order by posting messages to the victim on his Facebook profile page after sending her a letter telling her that he was posting about her on Facebook. See id. at 377-78. The victim viewed the posts after receiving the letter and after her mother alerted her of the posts. Id. The language of some of the posts indicated an awareness by the defendant that the victim had been reading them. Id. at 375-76. Under those circumstances, we concluded that the defendant's Facebook posts constituted contact with the victim in part because we saw "no meaningful difference between the defendant posting messages on Facebook with both the purpose and effect of communicating a message to [the victim], and the defendant positioning himself on a street corner with the knowledge and expectation that the victim would pass by, and then shouting to her." Id. at 376.

[¶13] We find the reasoning in Craig applicable to this case. Here, the defendant posted messages on his public Facebook profile page. One of the defendant's public posts began with "[n]otification" to "the resident of [the victim's address]," and referred to the owners of the property located at the victim's address by names nearly identical to the victim's and her deceased husband's names. Another post was labeled as a "[n]otification" to the victim and her husband, and stated that the victim and her husband and any family member had "better pay attention to this." The trial court found that the defendant conveyed a threat in another post which was directed at the victim and her husband and said "you better take this public notification seriously." On these facts, a reasonable factfinder could conclude — as the trial court did — that the messages in the posts were directed at the victim and that the defendant posted them to Facebook with the intent to notify her. The defendant's messages reached the victim when users on the platform recognized them as threats and alerted her, and she read them, thereby "'achiev[ing] a communication' with the victim indirectly." See id. at 377.

[¶14] The defendant nonetheless argues that he did not contact the victim in violation of the protection order because he did not take steps to convey the Facebook posts to the victim and he did not direct the victim's attention to them, unlike the defendant in Craig. We disagree. The evidence shows that the defendant created posts containing messages directed at the victim, that he posted them on his public Facebook page with the intent to notify her, and that the messages reached her. Accordingly, as in Craig, the

5

evidence supports a finding that the defendant posted messages on Facebook with "the purpose and effect of communicating a message" to the victim. Id. at 376. Such conduct is, by definition, indirect contact because the defendant, by using his Facebook page as the method to communicate his messages to the victim, communicated with the victim through means not directly aimed at her. Cf. id. at 377 (holding that defendant's Facebook posts were "indirect[]" communication). Consistent with our holding in Craig that "a broad interpretation of 'any action to communicate' comports with the legislative purpose of RSA chapter 173-B," id. at 373, we conclude that by posting the above-described messages to the victim on his public Facebook page with the intent to notify her, the defendant took a sufficient step to convey the messages to the victim to qualify as contact in violation of the protection order. Id. (observing that "more than merely creating a message" is required to be considered contact under RSA 173-B:1, IV, and that a defendant must take "steps to convey [the message] to the victim"). Accordingly, on this record, we conclude that the evidence is sufficient for a reasonable factfinder to conclude that the defendant's public notifications to the victim constitute indirect contact with the victim in violation of the protection order.

B. Protected Speech

[¶15] The defendant next argues that his social media posts cannot serve as the basis for imposing his suspended sentence or as a probation violation because his posts were speech protected by both the State and Federal Constitutions. The trial court found that the defendant's posts were not constitutionally protected speech because they were true threats. The State argues that there was sufficient evidence to support the trial court's ruling that the defendant's Facebook posts were true threats. We agree with the State.

[¶16] At the outset, we observe that the defendant's brief makes only passing references to the State Constitution and relies primarily on federal law in support of his arguments. Accordingly, we conclude that the defendant has not adequately developed an argument under the State Constitution, and we limit our review to his arguments under the Federal Constitution. See State v. Oakes, 161 N.H. 270, 278 (2010) (concluding defendant waived constitutional arguments because he made only "passing references" to the State and Federal Constitutions).

[¶17] Under the Federal Constitution, true threats are a category of speech not entitled to constitutional protection. See Counterman v. Colorado, 600 U.S. 66, 74 (2023). "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" Id. (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)). "The speaker need not intend to carry out the threat." Virginia, 538 U.S. at 359-60. "Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders," as well as "from the possibility that the threatened

6

violence will occur." Id. at 360 (quotations omitted). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." Counterman, 600 U.S. at 74 (quoting Elonis v. United States, 575 U.S. 723, 733 (2015)). However, for a true threat to fall outside the protections of the First Amendment, the speaker must have been at least reckless in issuing the true threat. See id. at 79.

[¶18] We conclude that the defendant's Facebook posts are true threats. The defendant posted messages directed at the victim, her deceased husband, and the victim's family. In one post, the defendant said: "[Victim's husband] your next death certificate will be real this time mother f***ers you are f***ing around with the wrong person a**hole I get my hands on you I will not be responsible for what I do to you I have severe PTSD." He concluded by saying: "Ps I will hunt you down." We agree with the trial court's conclusion that the post's language was, consistent with the defendant's other messages referring to both the victim and her husband, sufficient to show that the threat was directed at both the victim and her husband. The defendant said in another message that if the victim's husband's family — which would include the victim — comes near him: "I will clean their clocks and won't be responsible for my actions." Read together, the defendant's posts are true threats which express an intent to commit an unlawful act of violence against the victim. See id. at 74.

[¶19] The defendant further argues that his true threats are constitutionally protected speech because there was insufficient evidence to prove that he acted recklessly in issuing the threats. We disagree. First, the language of the posts is unambiguously threatening. The defendant said that he would: hunt down the victim and her husband; "clean their clocks" if they went near him; and not be responsible for his actions because he has PTSD. Cf. State v. Hanes, 171 N.H. 173, 181 (2018) (looking to threatening language used by defendant to establish his intent that his words would be understood as a threat). Second, a police officer testified that the defendant said to him that it would be "reasonable to say that his posts were putting a person at fear" and that he "could see how [his posts] would put someone at fear." Given the threatening language used, and the defendant's admission that his posts could put someone "at fear," we conclude that the evidence is sufficient to support the trial court's conclusion that the defendant acted recklessly when he issued the true threats. Accordingly, we conclude that the defendant's Facebook posts are true threats unprotected by the First Amendment.

[¶20] We conclude that the trial court did not err when it ruled that the defendant's Facebook posts constitute contact in violation of the protection order, and that they are not constitutionally protected speech. Accordingly, the trial court did not err when it found that the defendant violated the terms of his probation and his suspended sentence, and imposed the corresponding punishments for those offenses. We have considered the defendant's

7

remaining arguments and conclude that they do not warrant further discussion.  See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

Affirmed.

BASSETT, DONOVAN, and COUNTWAY, JJ., concurred.