2026 IL App (2d) 250185
No. 2-25-0185
Opinion filed May 8, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

DANIEL T. WEBSTER JR., Defendant-Appellant.

Appeal from the Circuit Court of Kendall County.
Honorable John F. McAdams, Judge, Presiding.
No. 24-CM-104

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial in the circuit court of Kendall County, defendant, Daniel T. Webster Jr., was found guilty of violating a plenary stalking/no-contact order (720 ILCS 5/12-3.9 (West 2022)) issued in favor of H.B. Defendant argues on appeal that the State failed to prove his guilt beyond a reasonable doubt. His argument requires us to address the novel issue of when social media posts constitute prohibited "contact" under the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2022)). We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On April 2, 2024, defendant was charged by complaint with violating a plenary stalking/no-contact order issued in favor of H.B. under the Act. The alleged date of the offense was February 5, 2024. At defendant's September 2024 jury trial in this case, documents from the underlying

proceeding, case No. 21-OP-356, were admitted into evidence. In that proceeding, on December 1, 2021, the trial court issued an emergency stalking/no-contact order in favor of H.B. The emergency order provided, *inter alia*, that "[defendant] may not contact [H.B.] *** in any way, directly, indirectly or through third parties, including, but not limited to, phone, written notes, mail, email, or fax." The emergency order would expire on December 22, 2021. On March 8, 2022, the court issued a plenary stalking/no-contact order (SNCO) in favor of H.B. The SNCO reiterated the prohibition quoted above. The SNCO would expire on March 8, 2024. Also admitted at the jury trial in this case was a transcript of the March 1, 2024, hearing in case No. 21-OP-356 on H.B.'s request to extend the SNCO.

¶ 4    H.B. testified at the jury trial that she met defendant in 2019 through a mutual acquaintance. She and defendant became friends, but after about a year H.B. made it clear to him that she was not interested in continuing the friendship. Nonetheless, defendant repeatedly contacted her. In the fall of 2021, H.B. attended a marketing conference where attendees were encouraged to "Google [them]selves" under all versions of their names. Searching under her name, H.B. discovered an account on Twitter (currently called "X") offering a "bounty" (*i.e.*, a reward) for a date with H.B. The profile name for the account was "Average Joe@shuddup_dude." H.B. suspected that the account belonged to defendant because it included a slogan that he frequently used. At the March 1, 2024, hearing in case No. 21-OP-356, defendant appeared and admitted that the Twitter profile named "Average Joe@shuddup_dude" belonged to him. On appeal, there is no dispute that the profile was defendant's. In what follows, all social media posts we reference were from defendant's "Average Joe@shuddup_dude" Twitter account.

¶ 5    H.B. recounted that she petitioned for an order of protection against defendant. She obtained an emergency order and, later, the SNCO, which would expire on March 8, 2024. After

the issuance of the SNCO, H.B. discovered additional posts that she suspected were addressed to her. One post from May 2022 stated:

> " 'I thought you had your s*** together' is a pretty s*** thing to say to someone. 'I hope you rot in hell' is my reply. It's s*** too, but so are you. Believe me, on 3/9/24 I will tell you that. Can't wait."

¶ 6    H.B. testified that, in February 2024, she petitioned the trial court to extend the SNCO. On February 21, 2024, while she was driving to a hearing on the matter, defendant suddenly "came up behind [her] super, super fast, and kind of like got right up on [her] tail and backed off and got right on [her] tail and backed off." Defendant then "whipped around [H.B.] really fast and slowed down in front of [her]." Her next scheduled court date was February 28, 2024. That morning, before court, H.B. "looked on social media as [she would] just to make sure, to brace [herself] if something really crazy [was] going to happen." She found a post that had a photograph of her car as she was driving to court on February 21, 2024. The post, dated February 29, 2024,[1] also had the following text:

> "You forgot, 'why are you in the left lane going the speed limit or less'. Me and the guy behind me have somewhere to go and you're not passing anyone. It's a passing lane you big law breaker you."

According to H.B., defendant admitted in court that he had taken the photograph in the post.

¶ 7    H.B. also discovered a post made on February 20, 2024 (the day before she encountered defendant on her way to court). The post stated, *inter alia*, "You are not squeaky clean, quit lying."

---

[1]H.B. must have had a different court date in mind because she could not have seen the February *29*, 2024, post before court on February *28*, 2024. Her confusion, however, does not bear upon a material issue in this case.

A post made the next day stated, "I'll spoil it for you rt now, you're not going to like the end of this. Trust me." A post made on March 1, 2024, after the hearing that morning, stated, "This is not over, stay tuned. #JusticeForJoe."

¶ 8      H.B. testified to three other posts. One post was made on March 5, 2024, and stated: "Don't you have anything better to do APD???" There were two photographs in the post. One was a photo of food. The other was a street-level photo of an overpass with traffic approaching it. H.B. testified that the second photo was "concerning" to her because the overpass marked the 500-foot perimeter from her place of employment, which defendant was prohibited from crossing. Regarding the reference to "APD," H.B. noted that one of the vehicles in the photograph was an Aurora Police Department vehicle.

¶ 9      Another post, made on March 8, 2024, stated: "I just got two more years added to my sentence. It's not over yet."

¶ 10     The final post H.B. discussed was made on March 22, 2024, and stated: "Hey Bill .. if you pay more attention to her, she'll pay less attention to me." H.B. testified that her boyfriend's name was Bill and that this was one of many posts that mentioned Bill.

¶ 11     On cross-examination, H.B. testified that, although she had her own Twitter account between 2021 and 2024, she did not use it to follow defendant's Twitter account. Asked how she discovered defendant's posts, H.B. replied that she initially did an Internet search under different variations of her name. That search uncovered the post in which defendant offered a "bounty" for a date with H.B. As for defendant's later posts, H.B. "was made aware of them by someone who does monitor [defendant's] account on occasion based upon the past history and other threats." After being informed of the posts, H.B. viewed them herself.

¶ 12    Defendant testified that he established his Twitter account for use with his T-shirt business. Asked what other use he made of the account, he answered: "Basically, to speak to the void, I guess, the public on the basis of my side of any story I was speaking of." The "target audience" for the posts he made between February and March 2024 was his 40 or so followers on Twitter, as well as the general public. He admitted that, in February and March 2024, he made posts "regarding this case." Those posts were not directed at anyone in particular, but rather to "the general *** public ***. To the void." Defendant was "[e]xpressing residual feelings about [his] own personal situation." He "did [not] expect anyone to see [the posts]."

¶ 13    On cross-examination, defendant agreed that "[his] posts were going out to the general public" and that H.B. was part of the general public. Defendant also agreed that, at the hearing on February 28, 2024, in the underlying case, he learned that H.B. "could see [his] [posts]." Yet the next day he made a post that contained a photograph of her. Defendant claimed that, when he took the photo, he did not know that H.B. was driving the vehicle. However, he admitted that, *when he made the post*, he knew that the vehicle belonged to her.

¶ 14    The jury found defendant guilty of violating the SNCO. The trial court sentenced defendant to 3 weekends in jail, 18 months of probation, and 18 months of GPS monitoring.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant challenges the sufficiency of the evidence to support his conviction of violating the SNCO. When a criminal defendant challenges the sufficiency of the evidence to sustain a conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 17    Section 12-3.9(a)(1)(A) of the Criminal Code of 2012 (720 ILCS 5/12-3.9(a)(1)(A) (West 2022)) provides:

"(a) A person commits violation of a stalking no contact order if:

(1) he or she knowingly commits an act which was prohibited by a court or fails to commit an act which was ordered by a court in violation of:

(A) a remedy in a valid stalking no contact order of protection authorized under Section 80 of [the Act]."

¶ 18    The remedial portion of the SNCO provides that "[defendant] may not contact [H.B.] *** in any way, directly, indirectly or through third parties, including, but not limited to, phone, written notes, mail, email, or fax." Defendant does not dispute that this remedy is statutorily authorized; indeed, the Act authorizes the trial court to "order the respondent not to have any contact with the petitioner or a third person specifically named by the court" (740 ILCS 21/80(b)(2) (West 2022)). Instead, he maintains that his posting material about H.B. to his social media account did not amount to even indirect "contact" with her. He further argues that his posts were constitutionally protected speech.

¶ 19    The SNCO incorporates the Act's definition of "contact," which is:

" 'Contact' includes any contact with the victim, *that is initiated or continued without the victim's consent*, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; placing an object on, or delivering an object to, property owned, leased, or occupied

- 6 -

by the victim; electronic communication as defined in Section 26.5-0.1 of the Criminal Code of 2012[2]; and appearing at the prohibited workplace, school, or place of worship." (Emphasis added.) *Id.* § 10.

Because the statutory definition of "contact" itself uses the word "contact," we must determine what that word means as used within the definition. The primary goal of statutory construction is to ascertain the intent of the legislature. *People v. Seymore*, 2025 IL 131564, ¶ 38. "The language of the statute is the best indication of the legislature's intent, and if the plain and ordinary meaning of that language is clear, our inquiry ends." *Id.* "In determining the plain, ordinary, and popularly understood meaning of a statutory term, it is entirely appropriate to look to the dictionary for a definition of the term." *People v. Castillo*, 2022 IL 127894, ¶ 24. As pertinent here, the transitive verb "contact" means "to get in communication with." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/contact (last visited Mar. 17, 2026) [https:// perma. cc/T6JM-K9H8].

¶ 20    Defendant argues that " 'contact,' as defined within the [SNCO], contemplates a purposeful act directed at a protected person" and that the salient question on appeal "is whether [defendant's] act of merely posting on a public social media account meets that definition." Defendant insists that the answer to that question is "no," reasoning, in part, as follows:

"[H.B.] did not follow [defendant's] account, and [defendant] did not publish the posts in a community that he knew [H.B.] participated in. [Defendant] never sent the posts to [H.B.], or anyone else, for that matter. Similarly, [defendant] did not use [H.B.'s] name or

---

[2]" 'Electronic communication' includes transmissions through an electronic device including, but not limited to, a telephone, cellular phone, computer, or pager, which communication includes, but is not limited to, e-mail, instant message, text message, or voice mail." 720 ILCS 5/26.5-0.1 (West 2022).

tag her account in the posts. Importantly, it was [H.B.] herself who deliberately sought out the public posts by searching for [defendant's] account and identifying content she believed to be about her. In fact, [H.B.] testified that she *never* unintentionally came across [defendant's] Twitter posts." (Emphasis in original.)

¶ 21 The parties do not cite, nor have we found, any Illinois authority directly addressing the issue of when posting to a social media account constitutes "contact" under the Act with an individual who is referenced but not named in the post, who has not subscribed to the poster's account, and whom the poster has not notified of the post. In support of his argument, defendant cites the Supreme Court of Georgia's decision in *Chan v. Ellis*, 770 S.E.2d 851 (Ga. 2015). The issue in that case was whether Chan violated Georgia's stalking law, which forbade one from " 'contact[ing] another person *** *without the consent of the other person* for the purpose of harassing and intimidating the other person.' " (Emphasis added.) *Id.* at 853 (quoting Ga. Code Ann. § 16-5-90(a)(1) (West 2014)). The trial court concluded that Chan violated this provision by maintaining a website on which he and others "published nearly 2,000 posts about Ellis, many of which [were] mean-spirited, some of which [were] distasteful and crude, and some of which publicize[d] information about Ellis that she would [have] prefer[red] not to be so public." *Id.* at 852-53. One of the posts was "written in the style of an open letter to Ellis, referring to her in the second person, and threatening to publicize additional information about Ellis and her family." *Id.* at 852. While it was undisputed that Chan "never caused any of these posts to be delivered to Ellis or otherwise brought to her attention," it was also undisputed that he "anticipated that Ellis might see the commentary on his website, and he may have even intended that she see certain of the posts, including the open letter to her." *Id.* Ellis "eventually did learn of the posts," and the trial court concluded that the posts amounted to " 'contact' " forbidden by the statute. *Id.* at 852-53.

¶ 22    The *Chan* court reversed the trial court's judgment, concluding that the posts were not prohibited " 'contact' " under the statute. *Id.* at 853. First, the court commented that, "[a]lthough one may 'contact' another *** by communicating with the other person through any medium, it nevertheless is essential that the communication be directed specifically *to* that other person, as opposed to a communication that is only directed generally to the public." (Emphasis in original.) *Id.* at 854. Thus, "[t]hat a communication is *about* a particular person does not mean necessarily that it is directed *to* that person." (Emphases in original.) *Id.* Applying these principles, the court concluded:

"The limited evidence in the record shows that Chan and others posted a lot of commentary to his website *about* Ellis, but it fails for the most part to show that the commentary was directed specifically *to* Ellis as opposed to the public. *As written, most of the posts appear to speak to the public, not to Ellis in particular*, even if they are about Ellis. And there is no evidence that Chan did anything to cause these posts to be delivered to Ellis or otherwise brought to her attention, notwithstanding that he may have reasonably anticipated that Ellis might come across the posts, just as any member of the Internet-using public might. The publication of commentary directed only to the public generally does not amount to 'contact,' as that term is used in [the statute], and most of the posts about Ellis quite clearly cannot form the basis for a finding that Chan contacted Ellis." (Emphases added and in original.) *Id.*

¶ 23    Second, the court reasoned that even if the posts (and particularly the open letter) constituted " 'contact' " with Ellis, "the evidence fail[ed] to show that such contact was 'without [her] consent,' " per the statute. *Id.* at 855 (quoting Ga. Code Ann. § 16-5-90(a)(1) (West 2014)). The court observed that "Ellis learned of that commentary—that is, it arguably was communicated

to her—only as a result of her choice to discover the content of the website." *Id.* The court concluded that the Georgia statute prohibited speech "only to the extent that it is directed to an unwilling listener." *Id.*

¶ 24    *Chan* is inapposite. Its primary holding—that Chan's posts did not constitute " 'contact' " under the Georgia statute—was based on the fact that Chan's posts were mostly *about* Ellis and not *directed to* her. Here, by contrast, several of defendant's posts were written in the second person and clearly were addressed to H.B. Moreover, liability in *Chan* ultimately required proof that the " 'contact' " was without Ellis's " 'consent,' " as that term was understood in the Georgia statute. The *Chan* court held that Chan's contact with Ellis through the website was consensual because she sought out the website. We do not understand the Act's definition of "contact" to operate in the same way here. That definition includes contact "that is *initiated* or continued without the victim's consent, *or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued*[.]" (Emphases added.) 740 ILCS 21/10 (West 2022). Defendant initiated contact by posting messages directed to H.B. He did so without her consent. After she learned that defendant was posting about her, she sought a no-contact order. There could be no clearer expression of a desire to avoid contact with defendant. Her subsequent efforts to seek information from third parties about what her stalker was posting were precautionary measures and cannot be viewed as consent.

¶ 25    A case cited by the State, *State v. Dunbar*, 2025 N.H. 26, is more analogous here than *Chan*. In *Dunbar*, the defendant was subject to a protective order that forbade him from " 'hav[ing] any contact with the [victim], whether in person or through third persons, including but not limited to contact by telephone, letters, fax, e-mail, the sending or delivery of gifts or any other method unless specifically authorized by the court.' " *Id.* ¶ 2. While the protective order was in effect, the

defendant posted messages on his Facebook page, referring to the victim and her deceased husband by pseudonyms that were close to their actual names. *Id.* ¶ 3. The court described the content of the messages as follows:

> "Some of the messages included phrases such as '[n]otification' to the 'resident of [the victim's address],' and '[n]otification to [the victim and her husband] [and] family member as well better pay attention to this.' In another message which the trial court found was directed at both the victim and her husband, the defendant said that they 'better take this public notification seriously.' Some of the messages included threats directed at the victim and her family." *Id.*

The victim read the messages after other Facebook users alerted her to their existence. *Id.*

¶ 26 The *Dunbar* court observed that the applicable statutory definition of " 'contact' " was " 'any action to communicate with another *either directly or indirectly*, including, but not limited to, using any form of electronic communication, leaving items, or causing another to communicate in such fashion.' " (Emphasis added.) *Id.* ¶ 8 (quoting N.H. Rev. Stat. Ann. § 173-B:1-IV (2022)). The court concluded that the prohibition against indirect communication forbade the defendant from "communicating [with the victim] by methods not directly aimed at her." *Id.* ¶ 10. Relying on its prior decision in *State v. Craig*, 112 A.3d 559 (N.H. 2015), the *Dunbar* court concluded that the defendant's posts violated this prohibition, reasoning as follows:

> "Facebook is a widely used social media website. [Citation.] The site is free to use by anyone with an email account, and the site allows users to share information, maintain a profile page, and send messages to other users, among other functions. [Citation.] A Facebook profile page is a webpage that is intended to convey information about the user. [Citation.] By default, a Facebook profile page is public, and when a user shares something

- 11 -

publicly on their profile page, anyone—'including people off of Facebook'—can see it. [Citation.]

In *Craig*, we held that the defendant contacted the victim in violation of a restraining order by posting messages to the victim on his Facebook profile page after sending her a letter telling her that he was posting about her on Facebook. [Citation.] The victim viewed the posts after receiving the letter and after her mother alerted her of the posts. [Citation.] The language of some of the posts indicated an awareness by the defendant that the victim had been reading them. [Citation.] Under those circumstances, we concluded that the defendant's Facebook posts constituted contact with the victim in part because we saw 'no meaningful difference between the defendant posting messages on Facebook with both the purpose and effect of communicating a message to [the victim], and the defendant positioning himself on a street corner with the knowledge and expectation that the victim would pass by, and then shouting to her.' [Citation.]

We find the reasoning in *Craig* applicable to this case. ***." *Dunbar*, 2025 N.H. 26, ¶¶ 11-13.

¶ 27    The *Dunbar* court rejected the defendant's argument that, because he took no steps to convey the Facebook posts to the victim, he could not be said to have contacted her. *Id.* ¶ 14. The court explained:

"The evidence shows that the defendant created posts containing messages directed at the victim, that he posted them on his public Facebook page with the intent to notify her, and that the messages reached her. Accordingly, as in *Craig*, the evidence supports a finding that the defendant posted messages on Facebook with 'the purpose and effect of communicating a message' to the victim. [Citation.] Such conduct is, by definition, indirect

- 12 -

contact because the defendant, by using his Facebook page as the method to communicate his messages to the victim, communicated with the victim through means not directly aimed at her." *Id.*

¶ 28 Here, even though defendant's posts did not use H.B.'s name, several were directed to her all the same. As noted, they were written in the second person, and H.B. was clearly the person to whom defendant was writing. Defendant's repeated use of "you," his ominous references to police, his photograph of the boundary of his stay-away order, his mention of the SNCO's expiration date, his photograph of H.B.'s car as she drove it, and his warning that "you're not going to like the end of this," were all clearly intended to convey a message to H.B. that she should fear him. These circumstances belie defendant's assertion that he was merely writing "to the void."

¶ 29 We are unpersuaded by defendant's argument, in his reply brief, that the posts were merely "about" H.B. Defendant offers this analogy:

"If [defendant] had invited a neighbor into his home and told the neighbor everything that he wished he could tell [H.B.], he would plainly be speaking *about* [H.B.]. However, unless [defendant] took some step to convey that speech to [H.B.]—either directly or indirectly— he would not have contacted [H.B.] in violation of the SNCO. Yet, under the State's theory, that same speech would retroactively become prohibited contact if the neighbor later, on their own initiative, repeated it to [H.B.]. Or, in direct analogy to this case, if [H.B.] sent the neighbor to [defendant's] home to explicitly find out what he would say. Indeed, under the State's approach, it could be argued that because the content of [defendant's] speech was about [H.B.], the content established his intent to contact her through the neighbor, despite there being no evidence that [defendant] took any action to convey the speech to [H.B.]." (Emphasis in original.)

The analogy is flawed. Communicating a message to one person with the expectation that it will be relayed to a third person amounts to indirectly contacting the third person, regardless of whether the speaker takes any additional "steps" to "convey" the message. More importantly, a Twitter post is not merely a casual private conversation with a neighbor. Posts on Twitter (like those on Facebook) are often readily available to the public, as were defendant's. Thus, when they are addressed to a specific individual, it is reasonable to assume that they will come to that person's attention. Under these circumstances, we reject defendant's argument that because [H.B.] "deliberately sought out" his posts, *he* cannot be said to have "contacted" *her*. Victims of stalking should not be required to endure the anxiety (or perhaps danger) of not knowing what their stalkers are saying to, or about, them, on social media. Thus, we decline to hold that a stalking victim forfeits the protections of a no-contact order by monitoring a stalker's social media accounts. Moreover, as noted, "contact" includes initiating contact with a victim against his or her express wishes. See 740 ILCS 21/10 (West 2022). Posting messages on social media directed to a stalking victim (who can be expected to monitor a stalker's social media) certainly qualifies as initiating contact with the victim.

¶ 30    Defendant further argues that to hold that his social media posts qualified as forbidden "contact," subject to criminal prosecution, would violate his right to free speech under the first amendment to the United States Constitution (U.S. Const., amend. I). Defendant argues that, as applied to his social media posts, the prohibition against contact would function as an impermissible content-based restriction on speech. We disagree.

¶ 31    The United States Supreme Court has explained that, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

- 14 -

Content-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A different standard applies, however, to restrictions on speech that are not based on content. As the Supreme Court has observed:

> "We have *** afforded the government somewhat wider leeway to regulate features of speech unrelated to its content. '[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' [Citation.]" (Internal quotation marks omitted.) *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).

Moreover, although content-neutral restrictions may affect some speakers more than others, "[s]o long as speaker distinctions are not a subtle means of exercising a content preference, they are not presumed invalid under the first amendment." *People v. Minnis*, 2016 IL 119563, ¶ 33.

¶ 32     As the Utah Court of Appeals explained in *Ragsdale v. Fishler*, 2025 UT App 36, 567 P.3d 586 (a case considering whether a no-contact order contained in a civil stalking injunction violated the first amendment), a content-neutral restriction passes constitutional muster if "(1) 'it furthers an important or substantial government interest,' (2) 'the governmental interest is unrelated to the suppression of free expression,' and (3) 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Id.* ¶ 48 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). The no-contact order in *Ragsdale* provided in relevant part:

" 'Do not contact, phone, text, mail, e-mail or communicate either directly or indirectly in any way with [Ragsdale]. Do not contact, communicate with, or gesture to others as they enter or exit [Ragsdale's place of business] or while they are located on the *** premises [of Ragsdale's place of business].' " *Id.* ¶ 23.

¶ 33 The *Ragsdale* court concluded that this provision was content neutral:

"This provision *** prohibits Fishler from contacting Ragsdale and others on, entering, or leaving [Ragsdale's place of business] in any way—regardless of the substance of the message. [Citation.] The provision thus does not distinguish a friendly wave 'hello' from the rude hand gestures Fishler frequently employed. Indeed, a determination of whether a violation of the No Contact Order occurred would stop after it was determined that Fishler directed a communication toward a person identified by the provision—it would not turn on the substance of the communication or on its effect on the person whatsoever." *Id.* ¶ 51.

¶ 34 The same is true here. In prohibiting communication with [H.B.], the SNCO drew no distinctions based on the substance of the communication and was, therefore, content neutral. Accord *People v. Relerford*, 2017 IL 121094, ¶ 34 (Stalking and cyberstalking statutes' "proscription against 'communicat[ions] to or about' a person that negligently would cause a reasonable person to suffer emotional distress" was content based because "communications that are pleasing to the recipient due to their nature or substance [were] not prohibited, but communications that the speaker 'knows or should know' are distressing due to their nature or substance are prohibited.") Content-neutral no-contact orders that prohibit only communication *to* (as opposed to *about*) a stalking victim are constitutionally permissible. *Ragsdale*, 2025 UT App 36, ¶ 52 (citing *Towner v. Ridgway*, 2008 UT 23, ¶ 20, 182 P.3d 347); accord *State v. Shackelford*,

825 S.E.2d 689, 694-95, 699-700 (N.C. Ct. App. 2019) (criminal statute defining the crime of stalking, in pertinent part, as willfully engaging in a course of conduct that would cause a reasonable person to "[s]uffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment" (1) was a content-based restriction on speech when applied to the defendant's e-mails and social media posts about a woman to whom the defendant had made unwanted romantic advances and (2) did not survive strict scrutiny where a content-neutral no-contact order that had previously been issued "clearly represented a less restrictive means by which the State could have pursued [the interests the statute was designed to serve]" (internal quotation marks omitted)).

¶ 35    Notably, defendant argues only that the SNCO is content based. He does not alternatively argue that, even if the SNCO were content neutral, it would not survive scrutiny under *McCullen* and *Ragsdale*. Having determined that the SNCO is not content based, we reject defendant's constitutional challenge to this prosecution.

¶ 36                                III. CONCLUSION

¶ 37    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 38    Affirmed.

*People v. Webster*, 2026 IL App (2d) 250185

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 24-CM-104; the Hon. John F. McAdams, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Zachary Wallace, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and David S. Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |